Good morning, Your Honors. Carolyn Wiggin from the Federal Public Defender's Office, arguing this morning for both Mr. Labrecque and Mr. Harrod. And may I please Did you try to keep your voice up? Sure. Carolyn Wiggin from the Federal Defender's Office, arguing for both Mr. Labrecque and Mr. Harrod this morning. And I would like to try to save five minutes for rebuttal, if I could. Your Honors, we come here this morning because even construing the evidence in the light of the day, I think it's most favorable to the government. Mr. Harrod and Mr. Labrecque simply did not commit the offenses in Counts 2 and 3, and Mr. Labrecque did not commit the offense in Count 1. Let's concentrate, if you would, on Counts 2 and 3, which is Section 2251A. Is it your argument, and correct me if I've truncated it in some way, that there was no evidence from which a reasonable juror of fact could conclude that either care or control, and we both know that control involves temporary supervision under the statute, that neither care or control were transferred to Juliet and Michael Labrecque because Irene Hunt kept custody and control over J? Is that your point? That's correct, Your Honor. So it has to be 100 percent transfer of custody or control as it would be in the sale of an item. Well, Your Honor, I would say that during the month, Irene, we call her Harrod. She's also called Irene Hunt, generally kept custody and control of her son. I would say that there are periods where she had one of the Labrecques care for them. You could say that during homeschooling, Juliet did. During a few errands, Michael Labrecque did. Is that? We're not here to retry the case. And if we were, it might come out a different way. We're here to answer the question of Jackson v. Virginia. Is there evidence from which you're, some evidence, not that evidence wasn't rebutted, not that it wasn't put in a different context by other evidence, but is there some evidence looking at the record that allows a reasonable trier of fact to say that Juliet and Michael Labrecque did have custody and control over J, at least in a general way? And what I'm thinking about is, it was Michael's house, correct? Correct. Michael was the local patriarch, was he not? Yes, although Irene was arguably higher in the religion, but yes, Your Honor. Let's talk about the evidence that there was. I'm particularly taken by the test, the government exhibit 5415, which is an entry of August 6, 1991, in which Michael, in his own handwriting, writes as to a telephone call regarding Rebecca, which is Juliet's religious name, and that Isaac, I guess, was the other patriarch's name. It turns out that I was correct in the fact that I am the patriarch on the scene and had the final authority. Now, isn't that enough by itself for the jury to say, if it's in his house, if he is the patriarch, he has the final authority, he allowed this pornographic act to take place, and therefore exercised control by omission? Well, Your Honor, I have two points I'd like to make in response to that. One is that, as you point out, under the statute, the way it's written and the way it's been construed by the courts, the idea of custody and control is – can include temporary custody and control. Can I ask a question? Does any of this really matter? In that, my – I mean, I guess my initial take on this is they – the Brecks had at least joint custody and control when they were in the – when she was in the house, when the child was in the house. Do you agree that you have a partial transfer of custody and control? In general language, you can. I think in the statute, to violate the statute, there has to be an actual transfer from one to the other. I think that's what the word transfer means. Does your position depend on that? Doesn't your position ultimately turn on the as a consequence language? I was going to get to that. I mean, isn't that the key to this, in fact? That's – yes. I mean, you could – I would agree with that, that – So why are you arguing the other? I mean, it seems to me that you have a hard row to hoe to say that there was not at least partial transfer and to say that the statute requires complete custody transfer. I don't know where you're getting either of those from, but I don't – so I'd like to know how the picture-taking, why your position is that it was not a consequence of what – assuming for the moment that some transfer occurred, was the picture-taking a transfer – a consequence of it? No, it was not, Your Honor. No one instructed Michael or Juliet Labreck to take those pictures, nor did they take those pictures. Irene Herod stayed in Texas for several reasons. One reason was to take those pictures. She's the one who set up the shoot. She told Juliet and Jay Herod exactly what positions to assume. She took the pictures. So the pictures were a consequence – And there is some evidence that Michael Labreck knew that the pictures were going to be taken. Pardon me, Your Honor? There is some evidence that Michael Labreck knew that the pictures were going to be taken. Just the fact that at some point when Irene comes in the home, the Polaroid is pointed out to her. And he bought film and he said something to the child, both before and after. There is some evidence. I would say that's – it's speculation that he knew that pornographic pictures were going to be taken, but even conceding that point. Didn't he say have fun as the boy was going up there? Well, he is in the room when he sees Irene order Juliet and the boy upstairs to the bedroom with her. I mean – With the Polaroid camera, which he found and supplied, and bought the Polaroid  idea. I would say that's a good role. There is some evidence of that. Well, but – please answer the question that Judge Berzon put you. If you concede that the statute allows culpability when there is less than total custody or control, if there is joint custody and control, isn't that the whole case? No, because I think that – I don't concede that, but even if you concede that for the sake of argument, somehow joint custody and control can be covered by the statute, there is nothing about saying Jay Herrod is going to live here, be homeschooled here, that leads to the production of child pornography. It's Irene staying in there. It's mom ordering the boy up there. It's mom taking the pictures that leads – It doesn't have to lead. The statute says that if they have knowledge that a consequence will be. Right? Knowledge that has a consequence. It isn't a purposeful test. It's not intentional. It's knowledge that as a consequence pornography will take place. And here we have some testimony by Irene that Juliet and Michael had – were charged with care and control of the child during the time that she was in the house in Texas, during that month. For temporary periods, but she also testified, as did Jay Herrod, that – Not temporary. She regarded herself as in charge of Jay Herrod. PR-150, do you know who was to look after Joshua once you were in Texas or once he was in Texas? The Lebrechts. Then again, PR-164, during that period, which is the month in Texas when the were you in charge of Joshua? Her answer, not really. Who was? Juliet. What about Michael Lebrecht? Yes, they were both. They were both in charge. If you accepted Berzon's interpretation of the statute, at least in her question, she used it, that joint custody and control is enough. Isn't that the end of the game? Well, those are some general answers she gave about the entire month. But then if you look at other testimonies she gave, cited in our brief and in RER. I agree. If we're trying the case, we should look at the evidence and weigh it. But we're not trying the case. We're reviewing the case under Jackson v. Virginia. Isn't what I've quoted sufficient evidence to allow a reasonable trier fact to find that the Lebrechts had some custody or control over Jay at the very moment that the photographs were taken when they could have said, as owners of this house, we won't allow it? Well, I would argue that certainly during the photo shoot, Irene retains it, has it. She's the one who orders him upstairs and tells him what to do. I think that if she has it, if she retains it, she has not transferred it. And that's why I think it's an impossible. But you see custody as being a unitary concept. Only one person can have custody. Within that statute, I believe that it does require transfer from one to the other for a violation to occur. Again. Especially if you take a look at 2251. I apologize. Go ahead. Well, first of all, it would be helpful to know what the basis for your unitary position is. Is it because the statute says a person having custody control who sells or otherwise transfers custody control, which assumes, which you think means that it has to be a unitary concept? It's the word transfer that I'm reading to mean the person who has custody from one to the other. It's not if you share custody or control of your child. It's if you transfer custody or control. And I read transfer to mean from the original guardian to another. But if, for example, you have two parents who have joint custody, right, and let's say one has the child three days a week and the other has the parent child four days a week, if the one who has the child three days a week transfers the authority over the child for three days a week to somebody else, does that count under the statute? If they transfer it for those days, knowing that as a consequence of the transfer, child porn will be produced. Right. That would be. But that goes back to the as a consequence. But that suggests that you can have, you can fraction up this custody. Yes. I would agree with that. And I think that there were certainly some periods in that month where one of the Labreck adults would be said to have custody or control. But I'm talking about, of course, the afternoon of the photo shoot where the original parent is there, is directing it, is taking the pictures. I don't think there's any way that Congress could have envisioned that being the idea that she's also transferred away her custody at that point I think is just impossible under these facts. You don't think that the mere fact that it took place in the Labreck household, the place they owned and controlled as to what went on there, that control does not refer to the control which is in the statute under 2251A? Well, they have to, Irene has to have transferred away custody temporary for that period because we've all agreed that custody and control can be periodic and can shift for small periods of time. So the question is not custody and control of the house, of the backdrop. It's of the child. Kagan. Kagan. Kagan. What about the notion that, oh, I'm sorry, that one of the reasons, the reason why Michael Harrod wanted to do this was to keep, basically to keep Juliette Labreck on the reservation. Well, could that be sufficient to fill in the as a consequence? In other words, they were planning, at least planning in the future to transfer custody and control and quite arguably transferred at least some custody and control during this time period. And could it be said that at least with regard to Michael Harrod, the reason why it was as a consequence was because the reason he had the scheme to begin with was because of the transfer of custody and control. Well, I think because you're saying Michael Harrod, so I just want to be sure. There's actually Alan Harrod. Not Michael Harrod. Alan Harrod. Alan Harrod. So, okay. Alan Harrod. He wants the pictures to be taken, but he doesn't order a Labreck adult. He could have easily ordered if the idea was. I understand it, but I'm trying to. It's helpful you listen to the question, okay? The question is, if we know that Alan Harrod knew that at some point, either while she was there or when she left, there was going to be a transfer of custody and control, right? So then the question is, was he acting with knowledge that as a consequence of the sale or transfer, the minor will be portrayed in the visual depiction, right? So the question is, what does this as a consequence of the sale or transfer attach to? It's not as a consequence of him being there. It's as a consequence of the sale or transfer. And I'm asking, could it attach to the fact that he was doing this to keep Juliet Breck essentially from squealing on the whole operation, I gather, and could that be sufficiently connected to the ultimate transfer of custody and control such that the statute applies? I don't think so, Your Honor. Okay. Why? I know you'd say that, but why not? So he's ‑‑ he's sending him to Texas. He wants pictures taken with Juliet in them, but he wants ‑‑ he directs Irene Harrod to take them. So I think that you can ‑‑ But he does have knowledge that as a consequence that there's going to be a sale or transfer, right? He does ‑‑ he does eventually transfer custody and control as a minor, right? Correct. All right. So ‑‑ and he has knowledge of that. So the ‑‑ and he has knowledge that there's going to be a portrayal and a visual depiction. Right. So the only whole is the as a consequence. Right. And he specifically says, mom, while you're still in Texas, I mean, before he goes the picture, but did he tell her to take a picture as a consequence of the transfer of custody and control? I would say no. It's as a consequence of having those two people in the same house so they can be depicted together. But he specifically wants custodial mother to be the one taking those pictures. So, yes, Jay Harrod and Juliet Labreck have to get to the same room for the pictures to be taken. But they're taken as a consequence of Irene still being there. She has to still be there. Can I ask what is the practical consequence of all this, given the sentences that already exist? It's just what I was going to ask. I know it's a sentence, but what is the practical consequence of the sentence, given what the other sentences already are? The only thing that has a practical consequence in this case is the fine issue. And I could move to that right now. I could do it in my rebuttal. Do you expect the sentence would be this, if we were to ‑‑ They're doing life, whatever happens. Whatever happens. And that would be one reason I wouldn't stretch this statute into a mom taking pictures of her own kids. I wouldn't stretch 2251a to cover this situation, especially in a case where both of these men are doing life no matter what. And so the fine would only apply to this ‑‑ to this counts and not the other ones? No, I'm sorry. This ‑‑ these arguments have nothing. So these arguments have no practical consequence. Well, my third argument about the unlawful manner, which was the fine was applied, not as to counts two or three. The fine generally ‑‑ So it has no practical sentencing consequence, because he's going to have a life sentence ‑‑ they're both going to have a life sentence no matter what. Whatever you do on counts one, two, and three will have no practical consequence. Whatever you do on the fine will have some practical consequence. I understand that. And I ‑‑ Why will there be no practical consequences if the conviction on 2251a is life sentence, but 2251, which is not either charged or a lesser included, why would that be different? Do you say they'll do life anyway? They're both doing 1,080 months on the other counts, and there's no ‑‑ Oh, on the other ‑‑ I mean, Mr. Herrod is actually doing a life sentence in California, so ‑‑ and that's been affirmed. He's probably never, ever going to see Federal prison. And Mr. Herrod, Mr. Lebrecq is doing 1,080 months in addition to life, followed by life in California, so. Okay. Thank you. So just for curiosity's sake, why did you appeal this? I mean, it's an interesting and complicated question, but why should we be ‑‑ why should you be or we be spending our time worrying about it? Because I think in everything that did happen, and many awful things happened, 2251A simply wasn't violated. The statute shouldn't be read to cover this conduct, and I think it's an important legal consequence. You think it has consequences for other cases? Is that what you're concerned about? Yes, I do. I mean, it's an interpretation of 2251A that I don't think can stand. I mean, I believe it's worth appealing. And if I could have a few minutes on rebuttal, I'd very much appreciate it. Yes. Thank you. Yes. May it please the Court. Good morning. My name is Laurel White. I am an assistant U.S. attorney from the Eastern District of California, and I am representing the Eastern District in this case. Keep your voice up, please. I beg your pardon? I'm sorry. Normally I talk very, very loudly. I might add that not only was Irene Hunt the one to testify that the custody and that the Lebrechts were in charge of Joshua and to be in charge of Joshua, but Joshua, excuse me, J. Herrod also testified to that effect, too. He testified that as soon as he arrived at the Lebrecht house, it was Michael Lebrecht and Juliette Lebrecht who were in charge of him. When she said, okay, I'm through with my son. Well, actually what she testified is that the principal reason why she was to stay there for a month was not necessarily to care for Josh, for J. The principal reason for staying for the month was in order to obtain the lowest airfare. And then she testified when I asked, well, was that the only reason? And she said no, to set Josh up and to take the pictures. So the purposes of her going there were to set her son up with the Lebrechts to take the pictures. And the reason for the lengthy period of time was in order to effect the lowest airfare, which she was able to achieve. Ms. White. Yes. Address the suggestion that was made by your learned colleague that the concept of transfer in statute which deals with sale or transfer of minors is a unitary concept. And it really means that one person has custody and then transfers it to another person. And there can't be any joint custody or fractional custody or proportional custody. Do you disagree with that idea? I disagree with that idea. I think there can be joint supervision. There can be joint control. Are there any cases under 2251A that discuss joint, fractional, or partial custody? There is very little case law under 2251. There's none. Well, the Bukhuli case is. But the only thing that the Bukhuli case really addressed was temporary supervision, that someone can have temporary control. So because of that, assuming that you accept that notion, that you can have temporary control, didn't Irene Hunt at least have custody and control during the period of the photographs? She had some control. That's correct. But I assert, Your Honor, that the gravamen of this statute is transferring custody or control, the two distinctly different concepts, to another with knowledge that as a consequence of that transfer or sale, sexually explicit images would be taken of the mind. Well, that's what the statute says, so it's not much of an assertion. But if you agree that she had custody and control during the period of the photograph and you have, I mean, it seems to me that to be coherent, you have to agree to that, then the question is, then you have to have two further points in order to get where you want to go. And one of them is that Michael and Juliet Labreck still also had custody and control during that period. And the second is that what happened there was a consequence of the custody and     control. And the second is that what happened during everything was Irene Hunt. So how do you get to B and C after A, i.e., that Irene Hunt at least had some custody and control, then how do you get to the fact that Michael and Juliet also for that limited time period had custody and control and that what happened was a consequence of their custody and control? Well, I submit that the custody was transferred to the Labreck's on the moment that Jay arrived in the house. And then the next question is whether it was with knowledge on the part of Michael Labreck of what was going to happen to him, whether sexually explicit images were going to be made. And if he had that knowledge at the time that custody was transferred, the crime was committed at that point. Irene Hunt didn't even need to take the images. There is no element that requires that the images had to have been taken. They could have been taken by someone else. The pivotal issue is whether the custody or control was transferred and whether the custody was transferred at the time of that transfer. And that's what happened in this case. At the time of the transfer, that as a consequence of the sailor transfer. So if what he had knowledge of was that Irene Hunt was going to take photographs, how is that knowledge that as a consequence of the sailor transfer there was going to be these photographs taken as opposed to that Irene Hunt was going to take some photographs? I'm not sure I – It's still the same point I made the first time. I don't think it helps to move the time period back. Because you still – what he has to know is that the photographs were going to be taken as a consequence of the transfer of custody or control. But he knew, presumably, let's assume he knew, that Irene Hunt had been directed by Michael – by Alan Herrod to take some photographs of the child and of his wife while they were there and that she was going to do it by herself, which she did. How does that fill in the as a consequence? Well, it couldn't have happened had the custody not been transferred to the Lebrex because Jay would not have been there. So is that what you're down to? I mean, are you down to the fact that he wouldn't have been there? I mean, that's kind of like, you know, you're walking down the street and if somebody hadn't, you know, been rude to you in the morning, you wouldn't have been walking down the street and then you got hit with a rock. And so the person who was rude to you in the morning is responsible for you getting hit with a rock. That's not usually the way we think of causation. Well, the whole point of Jay being there in the first place was for homeschooling and to be trained to be trained. And we later learned that the training involved sex. And the sexual conduct, I submit, began with the transfer and the photographing of Jay by Juliet. I'll be honest. All right. Well, that fills in Cat. 1, and I understand it fills in Cat. 1. And I'm willing to assume for the moment that there was sufficient evidence that Lebrex knew about that. But I still don't see how it fills in 2 and 3. Well, I think that the fact that the images were taken is a direct consequence of that boy being there. And that was part of the purpose. But he could have been there for what he said he was there for, i.e., to get homeschooled, and the same exact thing would have happened. Well, I think we need to add, though, the other additional purpose, and that was for purposes of sexual training. But why does that have to do with the photographs? Well, these were sexually explicit photographs. I mean, the desensitization of Jay began within two weeks of his transfer to the Lebrex. So are you suggesting that the jury could have assumed that somewhere, although there's no direct evidence of it, that Michael Lebrex was really behind the photographs, he was the one who was really directing the photographs? Is that what you're suggesting? No, I'm not suggesting that at all. I think that the genesis of this idea came from Alan Herrod. But it was all part and parcel of his objective, and that was the overreaching objective that Joshua Jay be trained to be the next patriarch. And that meant that he was going to be down in Texas for purposes of that sexual training, so that he could be photographed at Juliet, so that he could then start engaging in sexual conduct. The Adam and Eve days that — But if that's what he really thought, then why did he have his wife take the photos? I'm sorry? Why did his wife take the photos, then? Well, the other objective, as announced by Irene Hunt, was to be able to keep Juliet Lebrex in check. And so he wanted Juliet to stay with the program, essentially. And that's why Juliet was implicated in these images. Okay. But it means that what happened later is — well, what was intended to happen later doesn't seem to be connected to this particular incident, because in this particular incident, his wife was the moving party, not the Lebrex. Well, that's correct. She then went back. And so, you know, I don't know what would have happened had Irene stayed there. But her objective was not to stay there. Her objective was to drop Jay off, leave him with the Lebrex for the purposes of having the sexual training and for homeschooling, and he was not to return, except for periodic visits, until he was done. And then he was to assume the role of patriarch. I understand all that. I don't think it helps the problem. The Court indicated that — the Court seems not to have any problem with the sufficiency of the evidence as to Count 1. The — what the government explained was that the sexual conduct that Michael Lebrex was aware of was not just the acts that took place after Joshua turned 9, but rather that he was well aware that the taking of the sexually explicit images — Well, frankly, I'd have a lot of problem if it wasn't for the photographs. I don't see the evidence that he knew anything about what else was going to happen. No. I agree with you. And I think the jury was able to discern the difference with respect to Juliette Lebrex, because she was also charged in that same offense. And what was lacking in the evidence against Juliette Lebrex was that there was no statement from Juliette, say, on the day that Joshua arrived, Oh, by the way, Irene, let me know when you need the film that I can then get you for the photographs we're going to take. Had we had evidence like that, similar to what we had with respect to Michael Lebrex, I think we would have been able to sustain and convince all the jurors as to Juliette's guilt as to count one, but we weren't able to convince everyone. And I submit it's because there was not sufficient evidence to sustain that count. I'm running out of time. I know that the Court has not — Are you going to address the fine issue at all? I beg your pardon? The fine issue. The fine. The burden is on the defendant to establish his present or future ability to pay a fine. And I submit that the fact that they were qualified for CJA services weighs a presumption that they couldn't pay a fine? I don't know, because they also are obligated to show they have the present or future ability to pay a fine. The answer to that question is yes, because the statute says so. The comment notes say so, no? I beg your pardon? The answer to Judge Pius's question is yes, because the comments to the guidelines say that. Correct. All right. Correct. So there's a presumption. So they started off with the presumption that they couldn't pay a fine. That's correct. Okay. So what was in there? What did the government then show that — to get over that presumption? Well, they tendered — the defense said that the Court did not consider what fines were imposed with respect to any State sentences that were imposed. That the Court did not consider whether any restitution was imposed. There was no restitution imposed, and certainly the — Well, that doesn't necessarily mean that they're able to pay a fine, even if restitution is not imposed. No. But they're both serving lengthy sentences. But doesn't a presumption mean that you're shifting the burden and it's now the government's burden? Yes. Okay. So how did the government meet its burden? The government — Showing that they could pay the fine. The government argued at sentencing that the participation in the prisoner responsibility program, financial responsibility program, would have provided them with some means to be able to pay back a fine, and that when a fine is imposed or when restitution is imposed, which it was not in this case. And what did the district courts say? Didn't the district courts have the presumption backwards? Didn't the district courts say that the burden is on him and he hasn't shown it to me? He did. So isn't that wrong and isn't that just enough reason to send it back? No, I don't think so, because I think the Court acknowledged that — or the Court reasoned that there is the means to be able to pay a fine. These men are serving lengthy sentences. If a fine is imposed, then inmates are automatically prioritized with respect to prison jobs, and albeit they have to serve a long time to be able to pay back $25,000 in fine that — given the age of these defendants, but they could have made some sort of effort towards the payment of the fine. So I just — I submit it simply was not error on the part of the Court. But he could have imposed any amount of a fine. Is that what you're saying? I mean, how did he come up with $25,000? That was the lowest. That was the lowest of the guidelines. And so the Court, I think, recognized that these men were not going to be able to be able to come forward with substantial funds to be able to pay a fine. But the district court didn't say any — didn't say what you're saying. The district court said if no financial information is provided, how can you expect the Court to make an intelligent determination as to whether he could afford to pay a fine? And he didn't mention the — he didn't rely on the presumption that's in the guidelines. And he said that he could have some holdings, but he didn't say he did have some holdings. And he said that he didn't find the fact that he had court-appointed counsel persuasive, but he was supposed to at least derive a presumption from that. So just didn't he do it wrong? I don't think so. I don't think so. Did the government point to any — any — any — did they have income? Did they have resources? The difficulty in being able to make that argument, Your Honor, was we had — the defendants were not willing to disclose any of their financial holdings. I mean, outside the record, I know that Michael Labreck owned two homes down in Fort Worth, Texas. But we had no documents that we were able to offer the court to be able to establish that. Mr. Labreck absolutely refused to provide any information with respect to his financial holdings. Mr. Herrod refused to provide any information with respect to his financial holdings. Mr. Labreck — Didn't Labreck file a financial affidavit showing that he and his wife earned $2,900 per month? That was 20 — that was five and a half years prior to sentencing, Your Honor. Yeah. And he also — And he'd been in custody for about five years, right? He had. Well, and more significantly, however, he claimed a dependence on his financial holding. There were — these — these eight children were no longer children at the time of his sentencing. Okay. Did — did the government put that evidence into the record? Well, it — I believe the court knew that because the all — most of his children testified at court. And they were adults at the time. At the time of his sentencing, I believe we — but I — I don't recall specifically, Your Honor. I believe we informed the court that the only remaining minors of Mr. Labreck had been adopted by a family in Iowa. But other than those two children, all of his children were adults, fending for themselves. So unless there was some other dependent we weren't aware of, Mr. Labreck never mentioned that. And the same applied to Mr. Harrod. Mr. Harrod — all of Mr. Harrod's children were adults at the time. The only possible dependent that Mr. Harrod might have had was the minor child of his union with Angela Labreck, who was Mr. Labreck's oldest daughter. Did they — was the eight dependents' representation at the time of the application for informer porporus or at the time of the — the fine? The former. At the time he was qualifying. Yeah. For appointed counsel. Correct. We don't know if it was accurate or inaccurate then. It was inaccurate now. Correct. It may have been accurate in 2003. At the time of his sentencing, however, in 2009, it was no longer accurate. Okay. Thank you. You have two minutes for rebuttal. Thank you. I'll just address myself briefly to the issue of the fines. The record of what was said at the sentencing hearing is on Volume I of RER, pages 70 to 71. And the government, when the court said, what do you know about their financial holdings, said, I don't know. I have very little information with respect to the financial holdings of Mr. Harrod and Mr. Labreck. And she lists how long they've been in custody and notes that they haven't provided other information. So there was no information about who was a dependent then. There was no hint of ownership of two homes in Texas. So the only information before the court was the financial affidavits. And I think the guideline makes clear that it's the fact that you've qualified for appointment of counsels that supports an inference that you can't afford this. Now, there was never any discussion of what they could earn through the inmate financial responsibility program, and that would have been illogical in terms of Mr. Harrod being a dependent. He was serving the rest of his life in a California state prison. So I think the court has it right there. You know, the statute does say consider these factors before you impose a fine. Factors weren't really considered. The only evidence before the court was the financial affidavits, and there was no indication that either of these men had any wealth, and there was every indication that they would be spending the rest of their lives in prison. Okay. Is that it? That's it. Okay. Thank you. Thank you. Matter submitted. So our next case for argument is United States of America v. Terrence Breckinridge.
judges: Paez, Berzon, Bea